## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RALPH SMITH and IGNATIUS HARRIS,** individually and on behalf of all others similarly situated, | **Civil Action No.** |
| | **Class and Collective Action Complaint** |
| **Plaintiffs,** | **Jury Trial Demanded** |
| **v.** | **(Document Filed Electronically)** |
| **ALLEGHENY TECHNOLOGIES, INC., and STROM ENGINEERING CORPORATION,** | |
| **Defendant.** | |

## CLASS AND COLLECTIVE ACTION COMPLAINT

Plaintiffs Ralph Smith and Ignatius Harris ("Plaintiffs"), individually and on behalf of all others similarly situated, through their undersigned counsel, file this Class and Collective Action Complaint ("Complaint") against Defendants Allegheny Technologies, Inc. ("ATI") and Strom Engineering Corporation ("Strom") (together, "Defendants"), seeking all available relief under the Fair Labor Standards Act of 1938, 29 U.S.C. § 201, *et seq.* ("FLSA"), Pennsylvania law, and Oregon law for unpaid wages including overtime compensation due for their uncompensated labor. The following allegations are based on personal knowledge as to Plaintiffs' own conduct and are made on information and belief as to the acts of others.

## JURISDICTION AND VENUE

1.      Jurisdiction over Plaintiffs' FLSA claims is proper under 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

2.      This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because those claims derive from a common nucleus of operative facts.

3.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391. The events giving rise to Plaintiffs' claims occurred within this District, and Defendants conduct business in this District. The vast majority of the replacement workforce provided by Strom to ATI during the August 15, 2015 to March 4, 2016 lockout and labor dispute between ATI and the United Steel, Paper, and Forestry, Rubber, Manufacturing Energy Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW") performed work in this District. ATI is headquartered in this District and, based on information and belief, ATI's decision to use Strom to provide a replacement workforce occurred in this District, from its headquarters at 1000 Six PPG Place, Pittsburgh, Pennsylvania.

## PARTIES

4.     Plaintiff Ralph Smith is an individual currently residing in North Carolina. He was hired by Strom to serve as part of the replacement workforce during ATI's lockout of its unionized workers, and was jointly employed by Defendants ATI and Strom at ATI's Brackenridge, Pennsylvania facility (the "Brackenridge ATI Plant") as a non-exempt hourly worker from approximately August 2015 through March 2016, and, pursuant to 29 U.S.C. § 216(b) has consented in writing to being a Plaintiff in this action. *See* Ex. A (Opt-In Consent Form).

5.     Plaintiff Ignatius Harris is an individual currently residing in California. He was hired by Strom to serve as part of the replacement workforce during ATI's lockout of its unionized workers and was jointly employed by Defendants Strom and ATI at ATI's Albany, Oregon facility (the "Albany ATI Plant") as a non-exempt hourly worker from approximately August 2015 through December 2015, and, pursuant to 29 U.S.C. § 216(b) has consented in writing to being a Plaintiff in this action. *See* Ex. B (Opt-In Consent Form).

6.      Defendant Allegheny Technologies, Inc. ("ATI") is a Delaware corporation headquartered at 1000 Six PPG Place, Pittsburgh, Pennsylvania, and operates worldwide. ATI is a publicly traded company on the New York Stock Exchange. ATI operates specialty material manufacturing plants in over 30 locations across the United States, including in this District. This case concerns workers in ATI's Flat Rolled Product segment. ATI's sales in the Flat Rolled Product segment in 2016 totaled approximately $1.2 billion.

7.      Defendant Strom Engineering Corporation ("Strom") is a Minnesota corporation headquartered in Minnetonka, Minnesota. Strom provides replacement labor staffing for employers involved in labor disputes across the United States, including for co-Defendant ATI in this District.

8.      Defendants employ individuals engaged in commerce or in the production of goods for commerce and/or handling, selling, or otherwise working on goods or materials that have been moved in or produced in commerce by any person, as required by 29 U.S.C. §§ 206-207.

9.      Defendants' annual gross volume of business each exceeds $500,000.

## CLASS ACTION AND COLLECTIVE ACTION DEFINITIONS

10.     Plaintiffs bring Count I of this lawsuit pursuant to the FLSA, 29 U.S.C. § 216(b) as a collective action on behalf of themselves and the following collective of potential opt-in litigants:

> All current or former hourly employees who were provided by Strom as a replacement labor force and who performed work at any ATI facility in the United States during the August 15, 2015 to March 4, 2016 lockout and labor dispute between ATI and the United Steel, Paper, and Forestry, Rubber, Manufacturing Energy Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW") (the "FLSA Collective").

11.     Plaintiff Ralph Smith brings Counts II-IV of this lawsuit as a class action pursuant to Fed. R. Civ. P. 23, on behalf of himself and the following class:

All current or former hourly employees who were provided by Strom as a replacement labor force and who performed work at any ATI facility in Pennsylvania (Bagdad, Brackenridge, Latrobe, Midland, Natrona Heights, Vandergrift and/or Washington) during the August 15, 2015 to March 4, 2016 lockout and labor dispute between ATI and the United Steel, Paper, and Forestry, Rubber, Manufacturing Energy Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW") (the "Pennsylvania Class").

12.    Plaintiff Ignatius Harris brings Counts V of this lawsuit as a class action pursuant to Fed. R. Civ. P. 23, on behalf of himself and the following class:

All current or former hourly employees who were provided by Strom as a replacement labor force and who performed work at the Albany, Oregon ATI facility during the August 15, 2015 to March 4, 2016 lockout and labor dispute between ATI and the United Steel, Paper, and Forestry, Rubber, Manufacturing Energy Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW") (the "Oregon Class").

13.    The FLSA Collective, the Pennsylvania Class, and the Oregon Class are together referred to as the "Classes."

14.    Plaintiffs reserve the right to redefine the Classes prior to FLSA notice being disseminated or class certification, and thereafter, as necessary.

## FACTS

### A.    BACKGROUND

15.    Defendant Strom, a privately-held corporation, provides staffing in the form of strike and lockout replacement labor for unionized employers at locations throughout the United States.

16.    Employers' increasing use of temporary workers and hostility towards labor unions have been a feature of the modern labor market since the 1970s. Agencies like Strom, that specialize in strike staffing (including staffing during a lockout) represent an emerging force that

4

capitalize on the ample supply of individuals who have been pushed to operate within a temporary, informal workforce, and use these individuals as a weapon against organized labor.[1]

17.    In doing so, these strike-busting agencies and the companies that hire them not only exert downward pressure on working standards, benefits, and conditions for workers in general, but do so on the backs of temporary workers who are uniquely vulnerable to exploitation and limited in their ability to organize or advocate for their rights.[2]

18.    Although there has been a long history of employers hiring replacement workers to oppose union organizing, the scale of worker replacement afforded by strike-busting agencies like Strom takes this anti-union tool to an entirely new level.[3] Strike-busting agencies are able to mobilize hundreds or thousands of skilled or semi-skilled workers with little to no notice, lowering the hurdles for employers taking hardline stands against union demands and eliminating any negative implications to a company's productivity.

19.    These features are central to the services Strom offers, which are advertised as calling upon a "30,000+ employee database to identify Strom employees with project-relevant experience," "eliminate[ing] the lead-time generally associated with the activation of temporary replacement workers", and ensuring that Strom demonstrates "to union leaders that direct action is being taken to make sure all company obligations are met without exception." http://www.stromengineering.com/staffing/strike-staffing/ (last accessed June 30, 2017).

20.    Strom bills itself as offering "unparalleled experience" in aiding employers through a labor dispute:

---

[1] *See generally* Erin Hatton, *Temporary Weapons: Employers' Use of Temps against Organized Labor*, 67(1) Cornell I.L.R. 86 (2014).
[2] *Id.* at 105-06.
[3] *Id.* at 91.

If your business is facing a potential labor disruption, we can help you minimize the possible repercussions. Strom offers a five-phase approach for providing strike replacement staffing during a labor disruption situation: assessments, recruiting, pre-deployment, deployment, and disbandment. **When you utilize our comprehensive industrial strike staffing services, we will determine your business's unique needs, locate, accommodate, and train qualified workers, *secure safe transportation across picket lines*, and follow the appropriate protocol for strike staffing disbandment after a new labor contract has been approved**. Strom offers unparalleled experience developing comprehensive business continuity plans, custom-tailored to meet each client's specific needs.

http://stromengineering.rocket55staging.com/staffing/strike-staffing/ (last accessed June 30, 2017) (emphasis added).

21.     Strom describes an employer's motivations during a lockout as follows:

Other times, particularly in the United States, a lockout occurs when union membership rejects the company's final offer at negotiations and offers to return to work under the same conditions of employment as existed under the now-expired contract. In such a case, **the lockout is designed to pressure the workers into accepting the terms of the company's last offer**.

http://stromengineering.rocket55staging.com/about/resources/ (last accessed June 30, 2017) (emphasis added).

22.     Touting its position as "the nation's most reputable industrial strike staffing company" with over "55 years of experience in labor staffing and 25 years of experience providing strike staffing," Strom's promotional statements hint at the larger historical context within which Strom's activities and those of the companies with whom it contracts should be understood. http://www.stromengineering.com/about/about-strom/ (last accessed June 29, 2017).

23.     Strom's business pits working people against each other. "Their business is pain and misery for working people," an official of the Bakery, Confectionary, Tobacco Workers and Grain Millers Union was quoted in a local newspaper as saying. "They're just a misery machine."[4]

---

[4] *See* Len Boselovic, *Embattled unions resent Strom replacement workers,* Pittsburgh Post Gazette (Aug. 23, 2015), http://www.post-gazette.com/business/pittsburgh-company-

24.     Meanwhile, the structure of strike-busting agencies' employment of replacement workers places those workers in a uniquely precarious position that makes it nearly impossible for them to organize and advocate for their own labor rights.[5]

25.     While strike-busting agencies employ thousands of replacement workers, these workers do not work together consistently but are sent from workplace to workplace, isolated from both their replacement and union counterparts and thus limited in their ability to organize and advocate for themselves.

26.     Even if they are stationed at one worksite for an extended period, few replacement workers can risk engaging in union activities or other advocacy because they could immediately lose their current job as well as any future assignments by being identified as trouble-makers. As such, the structural ambiguity of temporary employment places logistical limitations on traditional labor protections.

27.     With neither job security, the ability to organize, nor ready access to traditional labor protections, replacement workers are extremely vulnerable. They are at the mercy of the strike-busting agencies and companies whose priorities center on ensuring continuity in their own operations, frequently at the expense of the work conditions and basic rights of the replacement workers that make this possible.

**B.      ATI'S 2015-16 LOCKOUT OF USW WORKERS**

28.     Strom's engagement with ATI provides an example of the way in which these strategies not only undercut union negotiating power and allow companies to evade their

---

news/2015/08/23/Stroms-replacement-workers-often-displace-union-force-Allegheny-Technologies/stories/201508210104.
[5] *See* Erin Hatton, *Temporary Weapons: Employers' Use of Temps against Organized Labor*, 67(1) Cornell I.L.R. 86, 105-06 (2014).

traditional obligations as employers, but lead to violations of the rights of the replacement workers who are least empowered to advocate for themselves.

29.     Defendant ATI, a NYSE publicly-traded corporation, manufactures and supplies specialty metals, including steel and other types of materials for its customers worldwide.

30.     ATI operates in two business segments: High Performance Materials & Components, and Flat Rolled Products. This case concerns the Flat Rolled Products segment.

31.     ATI's Flat Rolled Products segment produces, converts and distributes stainless steel, nickel-based alloys, specialty alloys, and titanium and titanium-based alloys, in a variety of product forms including plate, sheet, engineered strip, and Precision Rolled Strip products. The major end markets for ATI's flat-rolled products are oil & gas, automotive, food processing equipment and appliances, construction and mining, electronics, communication equipment and computers, and aerospace & defense.

32.     ATI employs approximately 8,500 full-time employees. Approximately 40% of its workforce is covered by collective bargaining agreements ("CBAs"), including with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW").

33.     ATI was a party to specific CBAs with the USW that expired on June 30, 2015.

34.     These CBAs covered production, maintenance, and hourly clerical employees at many of ATI's facilities in the United States, including ATI's operating plants in Bagdad, Brackenridge, Latrobe, Midland, Natrona Heights, Vandergrift, and Washington, Pennsylvania; Albany, Oregon; Lockport, New York; New Bedford, Massachusetts; and Waterbury, Connecticut.

35.     The USW-represented ATI employees at these locations worked under terms of the expired contracts into August 2015.

36.     When USW did not accept ATI's contract term demands, ATI instituted a lockout of its union workforce that was subject to these CBAs.[6]

37.     A lockout is a temporary work stoppage or denial of employment initiated by the management of a company during a labor dispute.

38.     The lockout, which began on August 15, 2015, was the biggest and longest in Western Pennsylvania in decades.

39.     The affected workforce included more than 2,200 employees at 12 facilities in ATI's Flat Rolled Product segment, including at ATI's plants in Bagdad, Brackenridge, Latrobe, Midland, Natrona Heights, Vandergrift, and Washington, Pennsylvania; Albany, Oregon; Lockport, New York; New Bedford, Massachusetts; and Waterbury, Connecticut.

40.     According to public news reports, the USW never threatened to strike or conducted a strike authorization vote during its talks with ATI. Instead, ATI locked these workers out of their jobs to put pressure on them to give in to ATI's demands over the contract negotiations. The dispute between the USW and ATI was over employees' health care.[7]

41.     The lockout lasted throughout the fall and winter and ended in March 2016, when ATI and the USW entered into a new contract. The lockout ended shortly after unemployment benefits ran out for many union members. ATI stopped paying for workers' health insurance in November 2015.

---

[6] *See USW Members at ATI Ratify New Contract*, Pittsburgh's Action News 4 (Mar. 1 2016), http://www.wtae.com/news/ati-usw-reach-tentative-deal-after-6month-lockout/38135720.

[7] *See* Justine Coyne, *What ATI's lockout means for the company, employees,* Pittsburgh Business Times, (Apr. 14, 2015), http://www.bizjournals.com/pittsburgh/news/2015/08/14/what-atis-lockout-means-for-the-company-employees.html.

42.    The new labor agreement reached between ATI and the USW was important to ATI's business. ATI's CEO, Richard Harshman, wrote about the dispute in ATI's 2016 Annual Report, describing "difficult labor negotiations" with a "seven-month work stoppage" that resulted in an agreement that "includes important changes to retirement benefit programs and other changes affecting plant operations that improve our cost competitiveness."[8]

43.    According to a Pennsylvania State University Professor and Director of the School of Labor and Employment Relations, "ATI's approach to labor relations is the worst kind of destructive approach that a company can have, and it can have long-lasting implications."[9]

## C.    ATI CONTRACTS WITH STROM TO PUT PRESSURE ON THE USW BY UTILIZING A REPLACEMENT WORKFORCE

44.    In response to the lockout, the USW mobilized its members to protest ATI's decision. Relevant to this case, these protests included picket lines and rallying at plant gates.[10]

45.    Picketing is a form of protest whose aims are to put public pressure on the business through attempting to prevent replacement workers from entering the site and providing publicity to the issue being protested.

46.    Hundreds of unionized USW workers marched to and around ATI's plant gates to protest the lockout.

---

[8] *See* ATI 2016 Annual Report, "2016 Creating Long-Term Value Thru Relentless Innovation," at http://ir.atimetals.com/~/media/Files/A/ATIMetals-IR/annual-reports/ati2016ar.pdf at 6.

[9] *See* Alex Nixon and Tom Yerace, *Bad Blood in ATI Lockout Expected to Linger*, TRIBLIVE (Feb. 23, 2016), http://triblive.com/business/headlines/10023623-74/ati-union-labor.

[10] *See* United Steel Workers, *Picket Lines are Strong in All Locations as ULP Lockout at ATI Rolls Into Second Week* (August 22, 2015), https://www.usw.org/news/media-center/articles/2015/picket-lines-are-strong-in-all-locations-as-ulp-lockout-at-ati-rolls-into-second-week.

47.     Throughout the lockout, USW members held picket lines at ATI's affected plants. At least one picket line, in Bagdad, Pennsylvania, just before Christmas, even continued in the midst of a snowstorm.

48.     For example, the picture below[11] was posted on the USW website during the lockout:



49.     While the affected USW workers suffered from the lockout through loss of work and wages, ATI took measures to avoid a work stoppage and concurrent damage to its business by employing a non-unionized temporary workforce provided by Strom to cross picket lines and keep the affected plants in operation.

50.     ATI utilized this Strom-provided temporary workforce to put pressure on the USW to accept ATI's demands while simultaneously keeping its operations running.

51.     Strom typically hires workers who are not from the local community where the lockout occurs, and who are in need of hourly work to support themselves and their families.

52.     These temporary workers, including Plaintiffs and Class Members, are brought in by Strom to the geographic area at issue and housed at local hotels and motels away from their families and communities during the pendency of the work assignment.

---

[11] *Id.*

53.     The temporary workers, including Plaintiffs and Class Members, worked long hours to keep production up at ATI's facilities during the lockout.  Specifically, ATI and Strom jointly scheduled Plaintiffs and Class Members to work 84 hour workweeks, 12 hours per day, 7 days per week.

54.     The work that ATI and Strom jointly required the replacement workforce to perform was difficult. The job requirements included the ability to "work in a standing position for [the] entire shift (12 hours/day) in a high heat/temperature manufacturing environment."[12]

55.     ATI and Strom paid Plaintiffs and Class Members on an hourly basis.

56.     The coordinated provision of temporary, replacement staffing, including getting the temporary workforce across the USW picket lines and into the plants, was integral and indispensable to ATI's ability to continue to put pressure on the USW during the pendency of the lockout and keep up production.

57.     Both ATI and Strom were well aware of the importance of providing the temporary workforce with safe and coordinated entrance through the USW picket lines and into ATI's facilities as a way to undermine the USW's negotiating power.

58.     For example, a job posting identified as being posted by ATI and/or Strom on Craigslist, a classified advertisement website, explicitly specified that the primary purpose of the employment was to address what was emphasized as "A LABOR DISPUTE SITUATION" in which "EMPLOYEES WILL BE TRANSPORTED ACROSS A PICKET LINE."[13]

---

[12] *See* Max Nisen, *This May Be the Worst Craigslist Job Posting Ever*, Quartz (Sept. 3, 2015), https://qz.com/494614/84-hour-work-week-picket-line-crossing-this-may-be-the-worst-craigslist-job-posting-ever/ (quoting craigslist advertisement).
[13] *Id*. (quoting craigslist advertisement) (emphasis in original).



59.     Notwithstanding the importance of the transport of the temporary workforce to and across picket lines – indeed, Strom's entire business model is built on and premised on it, and getting the temporary workforce through the picket lines was integral and indispensable for ATI to be able to keep up production in light of the lockout, so much so that ATI paid a third party, Strom, to do so – neither ATI nor Strom provided any compensation to Plaintiffs and Class Members for these activities.

**D.     WORK PERFORMED BY PLAINTIFFS AND CLASS MEMBERS**

60.     Defendants Strom and ATI hired Plaintiffs and Class Members to replace one or more individuals in ATI's union workforce throughout the pendency of the lockout.

61.     ATI and Strom are joint employers of Plaintiffs and Class Members.

62.     The work that Plaintiffs and Class Members performed, including traveling to and across picket lines, was performed at both ATI's and Strom's direction, and was both directly and indirectly in ATI's and Strom's interests and for their collective benefit.

13

63.    For example, ATI incurred a benefit from this work because it could keep its facilities open and exert additional pressure on the USW during the pendency of the lockout as a direct result of the work performed by Plaintiff and Class Members.

64.    Strom incurred a benefit from this work because it was being paid by ATI for its services in providing the temporary workforce during the lockout, including to transport replacement workers across picket lines.

65.    Defendants controlled Plaintiffs' work.

66.    ATI set the work schedules for Plaintiffs, which included a 12 hour day 7 days per week at its facilities, and ATI signed off on employee timesheets before they were submitted.

67.    ATI and Strom supervisors were stationed onsite at the ATI plants and observed Plaintiffs' work activities.

68.    ATI and Strom supervisors instructed and trained Plaintiffs in how to perform their job duties.

69.    ATI and Strom supervisors had the authority to hire and fire Plaintiffs.

70.    Strom issued Plaintiffs' and Class Members' paystubs, but was paid by ATI for the work performed by Plaintiffs and Class Members.

71.    Plaintiff Ralph Smith worked as an hourly non-exempt worker in the job title of train operator for Defendants between approximately August 2015 and March 2016.

72.    Plaintiff Ignatius Harris worked as an hourly non-exempt worker in the job title of furnace operator for Defendants between approximately August 2015 and December 2015.

73.    Plaintiffs' job duties included pressing buttons, operating a crane, lifting materials on to and off of machines, welding, and other repetitive and rote manual labor tasks.

74.    Plaintiffs and Class Members are not unionized workers.

75.     Plaintiffs and Class Members were paid hourly and were provided a *per diem*.

76.     Defendants required Plaintiffs and Class Members to stay overnight at a particular location, either at a particular hotel or a specific geographic area, and to meet at a central location outside of the plant early in the morning, which is when Plaintiffs' and Class Members' workday actually began.

77.     Plaintiffs and Class Members would get themselves to the central location assigned by Strom so that they could then ride together in assigned vans that were provided by Strom to ATI's locked-out manufacturing plants.

78.     Similarly, at the end of each day, the assigned vans would bring Plaintiffs and Class Members back to their assigned central location.

79.     Defendants controlled the manner and method of Plaintiffs and Class Members being transported from the central meeting location to and from the actual work sites.

80.     The work involved in traveling from the central location where Plaintiffs and Class Members were picked up in the assigned vans so that they could follow Strom's procedures in safely crossing the picket lines, including entering the plant, generally took between forty-five minutes to an hour or more, each way.

81.     This time resulted in approximately 1.5 hour to 2 hours of unpaid time for each worker each day during the lockout. As the workers typically worked seven days a week, this resulted in approximately 10.5 to 14 hours of unpaid time each week.

82.     Specifically, Plaintiffs' and Class Members' work schedule typically consisted of assembling in a central location assigned by Strom approximately ten to fifteen minutes before the vans left and signing into a sign-in sheet at that time that was maintained by Defendants, driving or riding the Strom vans to the ATI plant, assembling at the plant approximately five to fifteen

minutes before the start of their shift, working at the ATI plant for 12 hours per day, assembling at the vans at the end of their shift, and driving or riding the Strom vans back to the central location where Defendants had instructed and assigned Plaintiffs and Class Members to stay overnight.

83.     ATI and Strom's purpose behind requiring Plaintiffs and Class Members to travel in Strom vans was to safely transport them past the USW picket lines and to their ATI worksites, in order to pressure the USW into accepting ATI's labor bargaining demands while maintaining ATI's business operations.

84.     From the start of their assignments, Plaintiffs and Class Members were instructed by Strom at the direction of ATI that they were prohibited from driving their own vehicles to and from the ATI facilities for as long as there was an active union dispute. Plaintiffs and Class Members were told that they were required to travel to the ATI facilities in vans due to safety issues involved with crossing the picket lines.

85.     Accordingly, Plaintiffs' and Class Members' employment with ATI and Strom required that they cross active picket lines in the vans owned, leased, or rented by Strom with the expenses of the vans underwritten through Strom's contract with ATI.

86.     These situations were often hostile and had the potential to be dangerous. They included situations in which individuals would cross back and forth in front of the vans to slow and hinder their process, loudly yell obscenities and slurs at Plaintiffs and Class Members, physically rock the van with the replacement workers inside, attempt to open the van doors, hit the vehicles with picket signs or other foreign objects, attempt to puncture the vehicles' tires or scratch the vehicles, and film Plaintiffs and Class Members as they sat in the vans.

87.     Strom also provided ATI with security to assist in safely transporting Plaintiffs and Class Members to and across the picket lines.

88.     Defendants conducted orientations for Plaintiffs and Class Members prior to their beginning work at the ATI plants, which explicitly included instructions about how to properly perform their jobs while crossing the picket lines. For example, during orientations for the replacement workers, Plaintiffs were instructed not to respond to or engage with the individuals on the picket line.

89.     Plaintiffs and Class Members followed Defendants' instructions as a term and condition of their employment.

90.     Plaintiff Ralph Smith was required to follow Defendants' procedures and travel in a van provided by Defendants, and estimates that the associated work took more than one hour, for which he was not paid, every day that he worked (*i.e.*, approximately forty-five minutes to an hour in each direction to and from the work facility, including the waiting time reporting at the van, getting across the picket line, and arriving safely and leaving safely at the facility).

91.     Plaintiff Ignatius Harris was required to follow Defendants' procedures and travel in a van provided by Defendants, and estimates that the associated work took approximately one hour, for which he was not paid, every day that he worked (*i.e.*, approximately forty-five minutes to an hour in each direction to and from the work facility, including the waiting time reporting at the van, getting across the picket line, and arriving safely and leaving safely at the facility).

92.     In order to not have to pay additional drivers, Defendants typically required Plaintiffs or other replacement workers to drive the vans. For example, Plaintiff Ralph Smith was originally assigned to be a van driver and he drove a van full of replacement workers to and from the ATI facility until he was switched to a different shift for which there was already an assigned van driver.  Plaintiff Ignatius Harris rode in a van that was driven by another replacement worker.

93.     Throughout the lockout, Defendants maintained a policy of having Plaintiffs and Class Members assemble at a separate central location and travel in groups in vehicles that Defendants could readily identify as maintained by Strom. This policy provided a direct benefit to Defendants as it ensured that no unauthorized individuals, such as the USW workers, entered the facilities.

94.     Plaintiffs and Class Members were also required to carry identification cards that they received from Defendants to ensure that only the replacement workforce that had been cleared by Defendants to enter the ATI plants were able to do so.

95.     Plaintiffs and Class Members were also often required to store mandatory personal protective equipment ("PPE") provided by Defendants with them at their hotels and to transport the PPE to and from the worksite in the vans that were provided by Defendants. This PPE included some or all of the following: hard hats, metatarsal boots, safety glasses, gloves, and various heat and tear resistant clothing.

96.     All of this work, including the time driving or traveling in a company van, and the attendant associated time spent waiting and crossing picket lines to get into the facility, whether the Plaintiffs and Class Members were driving the vans or not, was unpaid.

97.     While the FLSA does not treat ordinary home-to-job-site travel as compensable, pursuant to Section 4(a) of the Portal-To-Portal Act, the Act does not change earlier definitions of compensable work. *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 28 (2005).

98.     Any time spent on the "principal activity or activities" of employment are still compensable and must be counted for purposes of workweek hours calculations. Further, activities "are compensable under the portal-to-portal provisions of the Fair Labor Standards Act if those activities are an integral and indispensable part of the principal activities for which covered

workmen are employed and are not specifically excluded[.]" *Steiner v. Mitchell*, 350 U.S. 247, 256

(1956). "The Supreme Court has interpreted this provision [of the FLSA] to mean that 'any activity

that is "integral and indispensable" to a "principal activity" is itself a "principal activity." *IBP*, 546

U.S. at 37; *see also Integrity Staffing Sols., Inc. v. Busk*, 135 S.Ct. 513, 517 (2014) ("This Court

has consistently interpreted the term principal activity or activities to embrace all activities which

are an integral and indispensable part of the principal activities.") (internal quotation marks and

citations omitted).

99.     An activity is "integral and indispensable to the principal activities that an

employee is employed to perform if it is an intrinsic element of those activities and one with which

the employee cannot dispense if he is to perform his principal activities." *Id.* Time spent by an

employee on a certain task is compensable if he could not perform his principal activities without

engaging in that task but would not be compensable if the task were "merely a convenience to the

employee and not directly related to his principal activities." *Id.*

100.    While engaging in the required travel in assigned vans from central assigned

locations for the purpose of transporting a temporary workforce; crossing picket lines; maintaining

ATI's production during the lockout; enhancing ATI's negotiation position with the USW;

transporting PPE that could not be kept in the locked out union workers' lockers at the plant; and

reducing Strom's and ATI's liability if a temporary worker were to be injured while crossing picket

lines; Plaintiffs and Class Members were jointly under the control of Strom and ATI.

101.    The required travel from central assigned pick-up locations is compensable work

time for Plaintiffs and Class Members under the FLSA, state law, and recent U.S. Supreme Court

precedent (and other federal court case law), because it was an integral and indispensable part of

the principal work activities of a temporary workforce that was specifically intended to replace a the union workforce during a lockout.

102.    The work associated with getting across picket lines from area hotels and motels was in no way merely a convenience for Plaintiffs and Class Members.  Indeed, Plaintiffs and Class Members could not perform ***any*** work at ATI's facilities if Strom did not coordinate their transport across the picket lines.

103.    The successful and safe transportation of Plaintiffs and Class Members was the primary purpose of the engagement between ATI and Strom, and enabled ATI to continue its operations, thereby putting significant downward pressure on the USW to accept ATI's terms with respect to contract negotiations.

104.    Defendants do not maintain accurate records of the actual hours that Plaintiffs worked each workday and the total hours worked each workweek.

105.    Defendants knew or should have known that the work that they required of Plaintiffs and Class Members in transportation to the facility and across the picket lines and associated work should be compensated under the FLSA, or relevant state law overtime requirements.

106.    Defendants are sophisticated national and multi-national businesses with access to knowledgeable human resource specialists and competent labor counsel.

107.    Defendants have acted willfully and with reckless disregard of clearly applicable FLSA and state law wage and hour provisions by failing to compensate Plaintiffs and Class Members for all hours worked in excess of forty (40) during the workweek, and benefitting from the replacement labor that they obtained in order to continue to maintain ATI's operations without properly compensating Plaintiffs and Class Members for this work.

108.    Strom profited from the work performed by Plaintiffs and Class Members and was paid by ATI for providing the services rendered by Plaintiffs and Class Members.

109.    If Strom and/or ATI were forced to compensate Plaintiffs and Class Members for the work spent for transportation to and across the picket lines, Strom would have made less money, and ATI might have been more inclined to enter into more favorable negotiations with the USW to end the lockout sooner. Both companies benefitted from the uncompensated labor of Plaintiffs and Class Members as described in this Complaint.

## COLLECTIVE ACTION ALLEGATIONS

110.    Plaintiffs bring this lawsuit pursuant to 29 U.S.C. § 216(b) as a collective action on behalf of the FLSA Collective defined above.

111.    Plaintiffs desire to pursue their FLSA claim on behalf of themselves and any individuals who opt-in to this action pursuant to 29 U.S.C. § 216(b) (the "FLSA Collective").

112.    Plaintiffs and the FLSA Collective are "similarly situated" as that term is used in 29 U.S.C. § 216(b), because all such individuals worked pursuant to Defendants' previously described common pay practices and, as a result of such practices, were not paid the full and legally mandated overtime premium for hours worked over forty (40) during the workweek. Resolution of this action requires inquiry into common facts, including Defendants' common compensation, timekeeping and payroll practices.

113.    Specifically, Defendants paid Plaintiffs and the FLSA Collective on an hourly basis but, as a result of requiring Plaintiff and the FLSA Collective to work off the clock at the beginning and end of each workday, failed to pay overtime at time and a half (1 ½) the employee's regular rate as required by the FLSA for all hours worked in excess of forty (40) per workweek. Defendants did not pay Plaintiffs and the FLSA Collective for any time spent reporting at the

assigned central location transport site, driving or being driven to ATI's facilities in vans provided by Strom, crossing the picket line, and arriving at the job site, even though this work was integral and indispensable to the replacement work that ATI contracted with Strom to provide in order to increase pressure on the USW during the pendency of the lockout.

114.    The similarly situated employees are known to Defendants, are readily and easily identifiable through payroll records, and may be located through Defendants' business and human resource records.

115.    Defendants employ many FLSA Collective Members. These similarly situated employees may be readily notified of this action through direct U.S. mail, email, and/or other appropriate means, and allowed to opt into it pursuant to 29 U.S.C. § 216(b), for the purpose of collectively adjudicating their claims for overtime compensation, liquidated damages (or, alternatively, interest), and attorneys' fees and costs under the FLSA.

## CLASS ACTION ALLEGATIONS

116.    Plaintiff Ralph Smith brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the Pennsylvania Class defined above.

117.    Plaintiff Ignatius Harris brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the Oregon Class defined above.

118.    The members of the Pennsylvania and Oregon Classes are respectively so numerous that joinder of all members is impracticable. There are more than forty (40) members of the Pennsylvania and Oregon Classes, respectively.

119.    Plaintiff Ralph Smith will fairly and adequately represent and protect the interests of the Pennsylvania Class because there is no conflict between his claims and those of the Pennsylvania Class, and Plaintiff's claims are typical of the claims of the Pennsylvania Class.

120.     Plaintiff Ignatius Harris will fairly and adequately represent and protect the interests of the Oregon Class because there is no conflict between his claims and those of the Oregon Class, and Plaintiff's claims are typical of the claims of the Oregon Class.

121.     Plaintiffs' counsel are competent and experienced in litigating class actions and other complex litigation matters, including wage and hour cases like this one.

122.     There are questions of law and fact common to the proposed Pennsylvania and Oregon Classes, which predominate over any questions affecting only individual Class members, including, without limitation: whether Defendants have violated and continue to violate Pennsylvania and Oregon law through their policies or practices of not paying their non-exempt workforce for all hours worked and overtime compensation. Defendants did not pay Plaintiffs and the Pennsylvania or Oregon Class for any time spent reporting at the central assigned location transport site, driving or being driven to ATI's facilities, crossing the picket line, and arriving at the job site, even though this work was integral and indispensable to the replacement work that ATI contracted with Strom to provide in order to increase pressure on the USW during the pendency of the lockout.

123.     Plaintiff Ralph Smith asserts claims that are typical of the claims of the Pennsylvania Class in the following ways, without limitation: (a) Plaintiff is a member of the Pennsylvania Class; (b) Plaintiff's claims arise out of the same policies, practices and course of conduct that form the basis of the claims of the Pennsylvania Class; (c) Plaintiff's claims are based on the same legal and remedial theories as those of the Pennsylvania Class and involve similar factual circumstances; (d) there are no conflicts between the interests of Plaintiff and the Pennsylvania Class Members; and (e) the injuries suffered by Plaintiff are similar to the injuries suffered by the Pennsylvania Class members.

124.    Plaintiff Ignatius Harris asserts claims that are typical of the claims of the Oregon Class in the following ways, without limitation: (a) Plaintiff is a member of the Oregon Class; (b) Plaintiff's claims arise out of the same policies, practices and course of conduct that form the basis of the claims of the Oregon Class; (c) Plaintiff's claims are based on the same legal and remedial theories as those of the Oregon Class and involve similar factual circumstances; (d) there are no conflicts between the interests of Plaintiff and the Oregon Class Members; and (e) the injuries suffered by Plaintiff are similar to the injuries suffered by the Oregon Class members.

125.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Pennsylvania Class and Oregon Class respectively predominate over any questions affecting only individual Class members, including, without limitation: whether Defendants have violated and continue to violate Pennsylvania and Oregon law through their policies or practices of not paying their non-exempt workforce for all hours worked and overtime compensation. Defendants uniformly failed to pay Plaintiffs and Class Members for the time alleged, and the resolution of this issue will resolve liability.

126.    Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversies alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy. The Pennsylvania and Oregon Classes are readily identifiable from Defendants' own employment records. Prosecution of separate actions by individual members of the Pennsylvania or Oregon Classes would create the risk of inconsistent

or varying adjudications with respect to individual Pennsylvania and Oregon Class members that would establish incompatible standards of conduct for Defendants.

127.    Without a class action, Defendants will retain the benefit of their wrongdoing, which will result in further damages to Plaintiffs and the Pennsylvania and Oregon Classes. Plaintiffs envision no difficulty in the management of this action as a class action.

**COUNT I**
**Violation of the Fair Labor Standards Act**
**(On Behalf of the FLSA Collective)**

128.    All previous paragraphs are incorporated as though fully set forth herein.

129.    The FLSA requires that covered employees be compensated for all hours worked in excess of forty (40) hours per week at a rate not less than one and one half (1 ½) times the regular rate at which they are employed.  *See* 29 U.S.C. § 207(a)(1).

130.    Strom is subject to the wage requirements of the FLSA because Strom is an "employer" under 29 U.S.C. § 203(d).

131.    At all relevant times, Strom is an "employer" engaged in interstate commerce and/or in the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. § 203.

132.    ATI is subject to the wage requirements of the FLSA because ATI is an "employer" under 29 U.S.C. § 203(d).

133.    At all relevant times, ATI is an "employer" engaged in interstate commerce and/or in the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. § 203.

134.     At all relevant times, Defendants Strom and ATI are joint employers pursuant to the FLSA. *See* 29 C.F.R. § 791.2.

135.    During all relevant times, Plaintiffs and the FLSA Class are covered employees entitled to the above-described FLSA's protections. *See* 29 U.S.C. § 203(e).

136.    Plaintiffs and the FLSA Class are not exempt from the requirements of the FLSA. Plaintiffs and the FLSA Class are entitled to be paid overtime compensation for all hours worked over forty (40) in a workweek.

137.    Defendants knowingly failed to compensate Plaintiffs and the FLSA Class at a rate of one and one-half (1 ½) times their regular hourly wage for all hours worked in excess of forty (40) hours per week, in violation of the FLSA.

138.    Defendants also failed to make, keep, and preserve records with respect to Plaintiffs and the FLSA Class sufficient to determine their wages, hours, and other conditions of employment in violation of the FLSA. 29 U.S.C. § 211(c); 29 C.F.R. §§ 516.5(a), 516.6(a)(1), 516.2(c).

139.    In violating the FLSA, Defendants, individually and collectively, acted willfully and with reckless disregard of clearly applicable FLSA provisions.

140.    Pursuant to 29 U.S.C. § 216(b), employers such as Defendants, who intentionally fail to pay an employee wages in conformance with the FLSA shall be liable to the employee for unpaid wages, liquidated damages, court costs and attorneys' fees incurred in recovering the unpaid wages.

## COUNT II
### Violation of the Pennsylvania Minimum Wage Act
### (On behalf of the Pennsylvania Class)

141.    All previous paragraphs are incorporated as though fully set forth herein.

142.    The Pennsylvania Minimum Wage Act of 1968 ("PMWA") requires that covered employees be compensated for all hours worked.

143.     The PMWA also requires that covered employees be compensated for all hours worked in excess of forty (40) hours per week at a rate not less than one and one-half (1 ½) times the regular rate at which he is employed.

144.     Defendants are subject to the overtime requirements of the PMWA because they are employers under 43 P.S. § 333.103(g).

145.     During all relevant times, Plaintiff and the Pennsylvania Class were covered employees entitled to the above-described PMWA's protections. *See* 43 P.S. § 333.103(h).

146.     Defendants failed to compensate Plaintiff and the Pennsylvania Class at a rate of one and one-half (1 ½) times their regular hourly wage for hours worked in excess of forty (40) hours per week.

147.     Pursuant to 43 P.S. § 333.113, employers, such as Defendants, who fail to pay an employee wages in conformance with the PMWA shall be liable to the employee for the wages or expenses that were not paid, court costs and attorneys' fees incurred in recovering the unpaid wages.

## COUNT III
### Unjust Enrichment
### (On Behalf of the Pennsylvania Class)

148.     All previous paragraphs are incorporated as though fully set forth herein.

149.     Defendants have received and benefited from the uncompensated labors of Plaintiff and the Pennsylvania Class, such that to retain said benefit without compensation would be inequitable and rise to the level of unjust enrichment.

150.     At all relevant times hereto, Defendants devised and implemented a plan to increase its earnings and profits by fostering a scheme of securing work from Plaintiff and the Pennsylvania

Class without properly paying compensation for all hours worked, including overtime compensation.

151.    Specifically, ATI and Strom knew that one of the principal activities that Plaintiff and the Pennsylvania Class would perform for them would be traveling across the picket lines in order for ATI to continue its operations during the pendency of the lockout. Strom and ATI could likely not have obtained a replacement workforce with local labor because of the stigma associated with crossing a picket line. They therefore found workers who needed to support their families from outside of the local community and induced them to work with relatively high hourly wages, and made arrangements to get them safely into ATI's facilities. Despite the fact that this work was integral both to ATI's and Strom's businesses, neither ATI nor Strom compensated Plaintiff and Pennsylvania Class Members for this work, saving ATI millions of dollars, and increasing Strom's profitability for the job.

152.    Contrary to all good faith and fair dealing, Defendants induced Plaintiffs and the Pennsylvania Class to perform work while failing to properly compensate for all hours worked as required by law, including overtime compensation.

153.    By reason of having secured the work and efforts of Plaintiffs and the Pennsylvania Class without proper compensation as required by law, Defendants enjoyed reduced overhead with respect to its labor costs, and therefore realized additional earnings and profits to its own benefit and to the detriment of Plaintiff and the Pennsylvania Class. Defendants retained and continue to retain such benefits contrary to the fundamental principles of justice, equity, and good conscience.

154.    Accordingly, Plaintiff and the Pennsylvania Class are entitled to judgment in an amount equal to the benefits unjustly retained by Defendants.

## COUNT IV
## Violation of the Oregon Minimum Wage Laws
## (On Behalf of the Oregon Class)

155.    All previous paragraphs are incorporated as though fully set forth herein.

156.    Oregon's minimum wage statute ("OMWS") requires that covered employees be compensated for all hours worked. *See* O.R.S. § 653.025; Or. Admin. R. 839-020-0010.

157.    The OMWS also requires that covered employees be compensated for all hours worked in excess of forty (40) hours per week at a rate not less than one and one-half (1 ½) times the regular rate at which he or she is employed. *See* O.R.S. § 653.261(1); Or. Admin. R. 839-020-0030.

158.    Defendants are subject to the overtime requirements of the OMWS because they are employers under O.R.S. § 653.010(3).

159.    During all relevant times, Plaintiff Ignatius Harris and the Oregon Class were covered employees entitled to the above-described OMWS protections. *See* O.R.S. § 653.269.

160.    Defendants' compensation scheme that is applicable to Plaintiffs and the Oregon Class failed to comply with O.R.S. §§ 653.025, 653.261(1).

161.    Defendants failed to compensate Plaintiff and the Oregon Class at a rate of one and one-half (1 ½) times their regular hourly wage for hours worked in excess of forty (40) hours per week, in violation of O.R.S. § 653.261(1); Or. Admin. R. 839-020-0030.

162.    Defendants also failed to make, keep, and preserve records with respect to Plaintiff and the Oregon Class sufficient to determine their wages, hours, and other conditions of employment in violation of § O.R.S. 653.045.

163.    Due to Defendants' failure to pay Plaintiff and the Oregon Class wages in conformance with the OMWS, Plaintiff and the Oregon Class are entitled to the wages or expenses

that were not paid as well as civil penalties, costs, disbursements, and attorney fees for prevailing in any portion of their claim for unpaid wages pursuant to O.R.S. §§ 653.055, 652.150, 652.200, 653.256.

164.     In violating Oregon law, Defendants, individually and collectively, acted willfully and with reckless disregard of clearly applicable provisions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek the following relief on behalf of themselves and all others similarly situated:

a.     An order permitting this litigation to proceed as an FLSA collective action pursuant to 29 U.S.C. § 216(b);

b.     Prompt notice, pursuant to 29 U.S.C. § 216(b), of this litigation to all potential FLSA Class members;

c.     An order permitting this litigation to proceed as a class action pursuant to Fed. R Civ. P. 23 on behalf of the Pennsylvania and Oregon Classes;

d.     Back pay damages (including unpaid overtime compensation, unpaid spread of hours payments and unpaid wages) and prejudgment interest to the fullest extent permitted under the law;

e.     Liquidated damages to the fullest extent permitted under the law;

f.     Litigation costs, expenses, and attorneys' fees to the fullest extent permitted under the law; and

g.     Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury for all issues of fact.

Dated:   July 10, 2017                                   Respectfully submitted,

   /s Sarah R. Schalman-Bergen
Shanon J. Carson (PA 85957)
Sarah R. Schalman-Bergen (PA 206211)
Michaela Wallin (NY 5269527)*
BERGER & MONTAGUE, P.C.

1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3053
Facsimile: (215) 875-4604
scarson@bm.net
sschalman-bergen@bm.net
mwallin@bm.net

Michael K. Yarnoff (PA # 62222)*
KEHOE LAW FIRM
Two Penn Center Plaza
1500 JFK Boulevard, Suite 1020
Philadelphia, PA 19102
Telephone/Fax: (215) 792-6676
myarnoff@kehoelawfirm.com

*pro hac vice* to be filed

*Attorneys for Plaintiffs and the Proposed Classes*

31